No. 16-2684

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

CORE WIRELESS LICENSING S.A.R.L.,

*Plaintiff–Appellee,*

v.

LG ELECTRONICS, INC., and
LG ELECTRONICS MOBILECOMM U.S.A., INC.

*Defendants–Appellants.*

Appeal from the United States District Court for the Eastern District of Texas in
Case No. 2:14-cv-00911, District Judge J. Rodney Gilstrap

## BRIEF OF APPELLEE
## CORE WIRELESS LICENSING S.A.R.L.

Marc A. Fenster
Reza Mirzaie
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-6991

Kayvan B. Noroozi
NOROOZI PC
1299 Ocean Ave., Suite 450
Santa Monica, CA 90401
Telephone: (310) 975-7074
Facsimile: (844) 975-7074

*Counsel for Appellee*

## CERTIFICATE OF INTEREST

Counsel for Core Wireless Licensing S.A.R.L. certifies the following:

1.　　The full name of every party represented by me is: Core Wireless Licensing S.A.R.L.

2.　　The name of the real party in interest represented by me is: Core Wireless Licensing S.A.R.L.

3.　　All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: Conversant Intellectual Property Management Inc.

4.　　The names of all law firms and the partners or associates who appeared for Core Wireless Licensing S.A.R.L. before the United States District Court, or are expected to appear in this Court, are:

RUSS, AUGUST & KABAT: Marc A. Fenster, Reza Mirzaie, Adam Hoffman, Neil S. Rubin, Jacob Buczko, James Pickens, Benjamin T. Wang, Brian D. Ledahl

NOROOZI PC: Kayvan B. Noroozi

CAPSHAW DERIEUX: S. Calvin Capshaw, Elizabeth DeRieux, D. Jeffrey Rambin

DOUGLAS GARY LICHTMAN

HUESTON HENNIGAN: John C. Hueston, Alexander C.D. Giza, Douglas J. Dixon, Marshall A. Camp, Padraic W. Foran, Michael J. Stephan, C. Mitchell Hendy,

i

Xinlin Li, Andrew J. Junker, Moez M. Kaba, Padraic W. Foran, Robert N. Klieger, Theresa M. Troupson, Xinlin Li, Zachary T. Elsea

BUNSOW DE MORY: Henry Bunsow, Brian A.E. Smith, Denise M. De Mory, Craig Y. Allison

Dated:  April 5, 2017    By:    */s/ Kayvan B. Noroozi*
                                  Kayvan B. Noroozi

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......................................................... i

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 2

STATEMENT OF THE ISSUES......................................................... 2

STATEMENT OF FACTS ............................................................... 3

SUMMARY OF THE ARGUMENT ..................................................... 5

STANDARD OF REVIEW .............................................................. 8

ARGUMENT............................................................................. 9

I.   The Asserted Claims Are Patent Eligible Under § 101. .................... 9

     A.   LG's Only "Abstract Idea" Argument is Waived..................... 9

     B.   The Claims Are Not Directed To The Abstract Idea Of An Index........ 12

     C.   The Claims Also Contain Computer-Specific Inventive Concepts....... 18

II.  The District Court Correctly Construed "Unlaunched State."........... 20

     A.   The Intrinsic Record Fully Supports The District Court's
          Construction. ...................................................... 20

     B.   LG's Non-Infringement Argument Requires Construing
          "Unlaunched State" To Mean "Not Running *Code*," Rather
          Than Simply "Not Running." ........................................ 24

     C.   LG's Proposed Construction of "Not Running *Code*" Would
          Exclude The Specification's Preferred Embodiments, And
          Clash With Several Claims, Which Teach That Applications
          May Remain "Unlaunched" Yet Be "Running Code."..................... 26

     D.   The Prosecution History Only Uses "Running" To Mean
          "Running In The Foreground," And Not "Running Code." .............. 31

     E.   The Prosecution History Thus Provides No "Clear And
          Unmistakable Disclaimer" Of "Not Displayed.".......................... 37

     F.   LG's Claim Construction Arguments Do Not Show Error................... 38

III. Construing "Unlaunched State" To Mean "Not Running" In Either
     Sense Of The Phrase Would Not Warrant Reversal. ....................... 47

IV.  The Jury Fully Considered LG's Non-Infringement Arguments As To
     "Reached Directly," And Substantial Evidence Supports The Verdict. ...... 49

i

A.  LG's New Claim Construction Request Is Waived, Judicially Estopped, Subject To "Extreme Disfavor," And Simply Wrong ....... 51

B.  LG's Re-Hashed Factual Disputes Are Still Unavailing. ...................... 54

V.  LG Did Not Prove *Blanchard* Anticipates, As The Jury Rightly Found ......... 57

A.  LG's Own Evidence Proved *Blanchard* Does Not Teach A "*Limited*" List ...................................................................................... 58

B.  The PTAB Also Found That *Blanchard* Does Not Teach A "*Limited*" List ...................................................................................... 61

C.  *Blanchard*'s Menus Are Only Offered Within Launched Applications, Not While The Applications Remain Unlaunched ...... 61

D.  The Jury Was Free To Give Dr. Rhyne's Testimony Little Weight ................................................................................................... 62

E.  LG's Arguments On Appeal Cannot Fill The Evidentiary Void. .......... 63

CONCLUSION ............................................................................................. 64

## TABLE OF AUTHORITIES

**Cases**

*Alice v. CLS Bank,*
    134 S.Ct. 2247 (2014) .............................................................. 9, 16, 18

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
    841 F.3d 1288 (Fed. Cir. 2016) ............................................ 18, 19, 20

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,*
    320 F.3d 1339 (Fed. Cir. 2003) .................................................... 39

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.,*
    224 F.3d 1308 (Fed. Cir. 2000) .................................................... 41

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,*
    807 F.3d 1283 (Fed. Cir. 2015) .................................................... 58

*Chi. Bd. Options Exch. v. Int'l Sec. Exch., LLC,*
    677 F.3d 1361 (Fed. Cir. 2012) .................................................... 41

*Clarilogic, Inc. v. Formfree Holdings Corp.,*
    No. 2016-1781, 2017 WL 992528 (Fed. Cir. Mar. 15, 2017) ........................ 9, 12

*Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.,*
    No. 2015-1992, 2017 WL 900016 (Fed. Cir. Mar. 7, 2017) .............................. 48

*D'Agostino v. MasterCard Int'l Inc.,*
    844 F.3d 945 (Fed. Cir. 2016) ...................................................... 46

*E.E.O.C. v. Boh Bros. Const. Co., L.L.C.,*
    731 F.3d 444 (5th Cir. 2013) ................................................... 57, 60

*Edge Sys. LLC v. Aguila,*
    635 F. App'x 897 (Fed. Cir. 2015) .................................................. 12

*Elec. Power Grp. v. Alstom,*
    830 F.3d 1350 (Fed. Cir. 2016) .................................................... 17

*Enfish LLC v. Microsoft Corp.,*
    822 F.3d 1327 (Fed. Cir. 2016) ............................................ 15, 17, 18

*Finisair Corp. v. DirecTV Grp., Inc.,*

523 F.3d 1323 (Fed. Cir. 2008).......................................................... 48

*GE Lighting Sols., LLC v. AgiLight, Inc.*,

750 F.3d 1304 (Fed. Cir. 2014)................................................... 30, 38

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,

527 F.3d 1318 (Fed. Cir. 2008)................................................... 10, 12

*Interactive Gift Express v. Compuserve Inc.*,

256 F.3d 1323 (Fed. Cir. 2001)........................................... 46, 52, 53

*Interactive Gift Express*,

256 F.3d at 1345 ................................................................. 52, 53

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,

656 F. App'x 504 (Fed. Cir. 2016) ................................................. 58

*Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*,

445 F.3d 1348 (Fed. Cir. 2006)...................................................... 29

*Logan v. Hormel Foods, Inc.*,

217 F. Appx. 942 (Fed. Cir. 2007)................................................. 39

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,

474 F.3d 1323 (Fed. Cir. 2007)...................................................... 29

*N. Telecom Ltd. v. Samsung Elecs. Co.*,

215 F.3d 1281 (Fed. Cir. 2000)...................................................... 53

*Oatey Co. v. IPS Corp.*,

514 F.3d 1271 (Fed. Cir. 2008)................................................. 29, 38

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,

806 F.2d 1565 (Fed. Cir. 1986)...................................................... 64

*PODS, Inc. v. Porta Stor, Inc.*,

484 F.3d 1359 (Fed. Cir. 2007)........................................................ 2

*Primos, Inc. v. Hunter's Specialities, Inc.*,

451 F.3d 841 (Fed. Cir. 2006)................................................... 40, 41

*Sage Prods., Inc. v. Devon Indus., Inc.*,

126 F.3d 1420 (Fed. Cir. 1997)................................................. 10, 12

iv

*Silicon Graphics, Inc. v. ATI Technologies*,
   607 F.3d 784 (Fed. Cir. 2010)............................................................. 63

*Singleton v. Wulff*,
   428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).................................. 10, 12

*SmartGene, Inc. v. Advanced Biological Labs., SA*,
   555 F. App'x 950 (Fed. Cir. 2015) ..................................................... 12

*Solvay S.A. v. Honeywell Int'l Inc.*,
   742 F.3d 998 (Fed. Cir. 2014)........................................................... 46

*Tech. Properties Ltd. LLC v. Huawei Techs. Co.*,
   849 F.3d 1349 (Fed. Cir. 2017).......................................................... 38

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002).......................................................... 48

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015) .................................................................... 8

*Thales Visionix Inc. v. United States*,
   No. 2015-5150, 2017 WL 914618 (Fed. Cir. Mar. 8, 2017)...................... passim

*Trading Technologies v. CGQ*,
   No. 2016-1616, 2017 WL 192716 (Fed. Cir. Jan. 18, 2017) ................. 16, 17, 18

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
   699 F.3d 1340 (Fed. Cir. 2012)........................................................... 9

*TVIIM, LLC v. McAfee, Inc.*,
   No. 2016-1562, 2017 WL 1056113 (Fed. Cir. Mar. 21, 2017)........................... 52

*Ultramercial, Inc. v. Hulu, LLC*,
   722 F.3d 1335 (Fed. Cir. 2013).......................................................... 13

*Vanderlande Industries Nederland BV v. Int'l Trade Comm'n*,
   366 F.3d 1311 (Fed. Cir. 2004).......................................................... 29

*Wi-Lan, Inc. v. Apple, Inc.*,
   811 F.3d 455 (Fed. Cir. 2016)................................................... 9, 55, 57

**Other Authorities**

*Microsoft Computer Dictionary* (5th ed. 2002).................................................... 39

**Rules**

Fed. R. App. P. 4 ...................................................................................... 2

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding was previously before this

Court or any other appellate court. Counsel are not aware of any cases that would

affect or be affected by this appeal.

## INTRODUCTION

No legal errors underlie the district court's liability judgment, and substantial evidence supports the jury's verdict.

The claims are patent eligible. Through new counsel, LG recognizes its arguments before the district court prove the claims are not directed to an "abstract idea." So LG abandons its prior positions and now argues the claims are merely directed to "an index." That argument is waived. It is also refuted by the claims, the specification, LG's prior positions, and three decisions of this Court.

The district court correctly construed "unlaunched state" as "not displayed." The intrinsic record fully supports that construction. LG's non-infringement position requires a construction of "not running" that is limited to "not running *code*." That construction conflicts with the specification, would exclude two preferred embodiments from the scope of every claim, and would directly clash with several claims. So LG is forced to seek prosecution history disclaimer. But the prosecution history provides no clear and unmistakable disclaimer of applications that are running code in the background, which LG's construction requires. Rather, the prosecution history further supports the trial court's construction.

LG's re-hashed factual disputes likewise fall far short of warranting judgment as a matter of law. With respect to the "reached directly" limitation,

LG's arguments rest on the premise that the status bar is not part of the home screen. LG's own expert, confronted with LG's own device manuals, admitted it is.

As for anticipation, LG provided no evidence that *Blanchard* teaches a "*limited* list" of data. Its expert's testimony also supported a finding that *Blanchard* does not teach a "limited list" of functions, but instead shows *all* of an application's functions. The Patent Trial and Appeal Board recently denied LG's *inter partes* review petitions based on *Blanchard* for those very reasons. A reasonable jury could have also found that *Blanchard*'s menus are only offered *within* the underlying applications, rendering the applications "launched," not "unlaunched." And given the extent to which LG's expert, Dr. Rhyne, was impeached, the jury was free to substantially discredit his anticipation testimony.

The Court should affirm the judgment of liability.

## JURISDICTIONAL STATEMENT

The district court entered final judgment of liability on March 14, 2017. 2:14-cv-911 Dkt. 647. This Court has jurisdiction. *See* Fed. R. App. P. 4(a)(2); *PODS, Inc. v. Porta Stor, Inc*., 484 F.3d 1359, 1365 (Fed. Cir. 2007).

## STATEMENT OF THE ISSUES

I.    Whether the district court correctly concluded the claims are neither directed to an abstract idea nor devoid of an inventive concept.

II.     Whether the district court erred in construing "unlaunched state" as "not displayed," rather than "not running," where the patents' specification makes clear that "unlaunched" applications may be "running" in the background.

III.    Whether the record establishes that no reasonable jury could find infringement if "unlaunched state" means "not running."

IV.    Whether the evidence, when viewed in the light most favorable to the verdict, points so overwhelmingly to the conclusion that LG's accused devices do not meet the "reached directly" limitation as to warrant reversal.

V.     Whether LG presented clear and convincing evidence that, when viewed in the light most favorable to the verdict, points so overwhelmingly to the conclusion that *Blanchard* anticipates the asserted claims as to warrant reversal.

## STATEMENT OF FACTS

Mathieu Martyn sought to design a way out of the maze of menu hierarchies that so frustrated mobile phone users like him. Appx10115-20. Around the turn of the millennium, Mr. Martyn worked as a graphical user interface designer at Symbian—a company created by leading mobile phone manufacturers like Nokia, Ericsson, and Motorola "to make a whole new generation of phones" we now know as "smartphones." Appx10113. His job was to design a new user interface "for the future." Appx10126. While riding the train to work one morning, the idea finally came to him. Appx10121. If users could access a "snapshot" of

applications' key data and functionality "at the top level" of the device, Appx10122-23, they would be spared the "frustrating, time-consuming experience" of "hunting around" the small screen of a mobile phone to find the desired functionality. Appx10115-16.

The specifications and claims of U.S. Patents 8,434,020 and 8,714,476, titled "Computing Device With Improved User Interface For Applications," set forth Mr. Martyn's innovative solutions. The specifications address the "complex human factors" design problem of giving users "rapid[ ] access to the right data/functionality" on computing devices. Appx34 (Background). The disclosed solution is an innovative "application summary window" that is "reached directly" from a device's "main menu," giving the user access to specific functionalities of an application "without actually opening the application up." Appx35 (2:65-4:5). From the summary window, which resides outside the interface of the underlying application itself, the user can directly access "core data/functionality" of the application "by simply selecting that data/functionality." Appx35 (3:8-16).

During trial, the district court identified claim scope disputes as to two limitations: "while the application is in an *un-launched state*" and "an application summary window that can be *reached directly* from the main menu." Appx10277-78. After hearing argument, it construed "unlaunched state" as "not displayed"—

4

rejecting LG's proposal of "not running"—and construed "reached directly" as "reached without an intervening step," as LG had proposed. Appx10278-97.

Applying those constructions, Core presented detailed evidence of LG's infringement as to each limitation of each claim, as detailed herein. As to "unlaunched state," there was no dispute (and there remains no dispute) that the applications running in LG's accused devices display an "application summary window" for applications that remain "not displayed." With respect to "reached directly," LG argued the "status bar" at the top of the devices' home screen is not part of the home screen itself. Confronted with LG's own device documentation, LG's expert admitted otherwise. Appx10668-69.

After a week-long trial, the jury found LG to infringe Claims 11 and 13 of the '020 patent, and Claims 8 and 9 of the '476 patent, which are not invalid. The district court accepted the liability verdict, Appx30, and entered judgment of liability on March 14, 2017. 2:14-cv-911 Dkt. 647.

## SUMMARY OF THE ARGUMENT

The inventions of the '020 and '476 patents are not directed to abstract ideas. Mr. Martyn invented an improved graphical user interface that provided specific solutions to specific problems in the field of art. To argue otherwise, LG abandons its positions before the district court and relies on a new argument that the claims are merely directed to "an index." That argument is both waived and

wrong. The underlying claims are not *directed to* "an index" simply because they *make use* of that general concept. Nor are the claims otherwise devoid of an inventive concept. Virtually all software innovations use existing computing hardware. Such innovations are nonetheless patent-eligible when they bring existing components together in an unconventional way, as Mr. Martyn did.

The district court did not err in construing "unlaunched state." LG's non-infringement argument rests on a construction of "not running" in the narrow sense of "not running *code*," rather than the broader sense of "not running in the foreground of the display," *i.e.*, "not displayed." The specification does not support a construction of "not running code." That construction would exclude two preferred embodiments, including a figure, from the scope of all claims of both patents. Those embodiments teach application summary windows for applications that remain "unlaunched" but are "running code" in the background. It would also conflict with several claims that cannot be practiced unless the underlying applications are "running code." The prosecution history also does not support the construction LG seeks. The patentee distinguished the prior art as teaching menus that appeared *within* the underlying applications themselves, such that the applications were running in the foreground (displayed) and not "unlaunched." It did not narrow "application in an unlaunched state" to "application not running *code*," or disclaim applications running in the background from "unlaunched

6

state." There is simply no unmistakable disclaimer. Moreover, numerous claims separately recite "code . . . running" alongside "unlaunched state."

The intrinsic record instead supports the district court's construction of "not displayed." The specification explains that the innovative summary window can display data *from* an application "without actually opening the application up." Appx35 (3:64-4:2). The trial court's construction encompasses such preferred embodiments, is consistent with the claims, and comports with the prosecution history and plain meaning.

Nor would the construction LG seeks warrant reversal. "Not running" encompasses "not displayed," *i.e.*, not running in the foreground. And "not running code" would not warrant reversal on this record, but simply require remand.

Extensive testimony from both parties' experts supports the jury's finding that the notification shade in LG's devices may be "reached directly" from the home screen, which includes the status bar. LG's argument rests on the premise that the status bar is not part of the home screen. Its own expert admitted otherwise. Appx10668-69. Substantial evidence thus supports the verdict. And LG's belated request for a new "interacting with" limitation is waived, estopped, wrong, and ultimately irrelevant. Since the status bar is part of the home screen, a user "interacts with" the "main menu" when reaching the notification shade.

Finally, LG did not prove that *Blanchard* teaches each limitation of each claim by clear and convincing evidence. LG presented no testimony that *Blanchard* teaches a *limited* list of data, and its expert's testimony supported the conclusion that *Blanchard* does not teach a *limited* list of functions. The Patent Trial and Appeal Board recently rejected LG's *inter partes* review petitions on that very basis, further demonstrating that the jury's verdict was reasonable. LG's testimony also permitted the jury to conclude that the menus in *Blanchard* appear *within* the underlying applications, which are thus launched, not "unlaunched."

## STANDARD OF REVIEW

This Court reviews subject-matter eligibility under § 101 de novo. *Thales Visionix Inc. v. United States*, No. 2015-5150, 2017 WL 914618, at *2 (Fed. Cir. Mar. 8, 2017).

The Court reviews a district court's ultimate claim construction de novo and any underlying factual determinations involving extrinsic evidence for clear error. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

The Court reviews rulings on judgment as a matter of law issued by district courts in the Fifth Circuit with "great deference to a jury's verdict and will reverse only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court

believes that reasonable jurors could not arrive at any contrary conclusion." *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 461 (Fed. Cir. 2016) (quotations omitted).

Applying that standard, this Court will not disturb a jury's verdict so long as it is supported by substantial evidence. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012). Substantial evidence is not definitive evidence, but rather "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

## ARGUMENT

## I.    The Asserted Claims Are Patent Eligible Under § 101.

In *Alice v. CLS Bank*, the Supreme Court provided a two-step framework for analyzing subject matter eligibility under § 101. 134 S.Ct. 2247, 2355 (2014).

First, this Court must determine whether the claims are directed to an "abstract idea." *Id.* "If not, the inquiry ends." *Clarilogic, Inc. v. Formfree Holdings Corp.*, No. 2016-1781, 2017 WL 992528, at *2 (Fed. Cir. Mar. 15, 2017).

Second, only "[i[f the claims are determined to be directed to an abstract idea," this Court next considers "whether the claims contain an 'inventive concept' sufficient to 'transform the nature of the claim into a patent-eligible application.'" *Id.* (quoting *Alice*, 134 S.Ct. at 2355).

## A.    LG's Only "Abstract Idea" Argument is Waived.

"No matter how independent an appellate court's review of an issue may be, it is still no more than that—a review." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126

F.3d 1420, 1426 (Fed. Cir. 1997). Thus as a general rule, "a federal appellate court does not consider an issue not passed upon below," and this Court will not consider "arguments not presented to the district court." *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322–23 (Fed. Cir. 2008) (quoting *Singleton v. Wulff,* 428 U.S. 106, 120 (1976)).

LG's § 101 challenge fails at the outset because it entirely rests on a new argument that is inconsistent with its arguments before the district court.

On appeal, LG argues that the claims at issue are directed to the abstract idea "of an index," or "an index to access desired content." Blue Brief 1, 20, 24-29.[1] LG's "index" characterization is its sole basis for arguing the claims are directed to an "abstract idea."

Yet before the district court, LG never argued that the claims are merely directed to an index. To the contrary, it acknowledged they are directed to a far more specific concept. LG argued that the claims are "directed to the abstract concept of [1] displaying [2] an application summary window [3] while the application is in an unlaunched state." Appx4228 (numbering added). It further argued that the claims are directed to "[1] an application [2] having a 'launched'/ 'unlaunched' distinction [3] when initiating a display. . . ." Appx4230 (numbering added).

---

[1] Citations to LG's brief are made as "Blue Brief" [page number(s)].

LG's argument on appeal and its arguments before the district court are not the same: a mere "index" is not [1] "displaying" [2] "an application summary window" [3] for "an application" [4] "having a launched/unlaunched distinction" [5] "while the application is in an unlaunched state." Appx4228-30.

Indeed, LG's principal brief never expressly argues that its new "index" theory is consistent with, or preserved by, its arguments before the district court. LG instead attempts to reconcile the two positions casually in passing, stating that it argued to the district court "that the main focus of the claims was an alternative 'menu'—basically, a form of index to access desired content." Blue Brief 28. But LG provides no citation to the record to show it made such an argument. That is because LG did not. To the contrary, LG previously argued that the main focus of "the '020 and '476 patents is the distinction between an application being in a 'launched'/ 'unlaunched' state when it displays additional information" and that "displaying information in a menu *about an unlaunched application* is an unpatentable abstract idea." Appx4228 (emphasis added). Accordingly, LG's new "index" argument and its previous arguments before the district court are not the same and cannot be reconciled.

Moreover, LG's change in positions is material. The district court expressly observed that the concepts LG previously claimed to be "abstract ideas"— "'application,' 'summary window,' and 'unlaunched state"—are not abstract at all,

11

but instead "are specific to devices like computers and cell phones." Appx9561. And it noted that "LG identifie[d] no analog to these concepts outside the context of such devices." *Id.* LG now presents its new "index" theory to cure the flaws the district court correctly found with its position below.

The Court should not permit LG to so fundamentally shift positions on appeal. Because LG's "index" argument is entirely new, it is waived and cannot provide a basis for appellate review. *See SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 F. App'x 950, 954 (Fed. Cir. 2015) (holding that SmartGene waived its § 101 argument because it was "not appropriately developed" in its briefing below); *Sage*, 126 F.3d at 1426 ("this court does not 'review' that which was not presented to the district court."); *Golden Bridge Tech.*, 527 F.3d at 1322–23; *Singleton*, 428 U.S. at 120. LG has offered no reason to deviate from that important principle here, and has waived that issue as well. *Edge Sys. LLC v. Aguila*, 635 F. App'x 897, 908 (Fed. Cir. 2015) ("Mr. Aguila has not proffered any argument to warrant deviation from this general rule and has waived this issue.").

Since LG has no other argument as to the "abstract idea" step, the Court's § 101 inquiry should end here. *Clarilogic*, 2017 WL 992528, at *2.

### B.    The Claims Are Not Directed To The Abstract Idea Of An Index.

In addition to being waived, LG's "abstract idea" arguments fail on their merits. The "abstract idea" inquiry is not an exercise in finding some means to strip

away enough substance from a claim to render it abstract. *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1344 (Fed. Cir. 2013). "[A]ll inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Thales*, 2017 WL 914618, at *3 (quotations omitted). This Court has emphasized that it must "ensure at step one that we articulate what the claims are directed to with enough specificity to ensure that the step one inquiry is meaningful." *Id.*

Thus in *Thales*, the Court distinguished between identifying an "abstract idea" *underlying* the claim, and identifying what the claim is "*directed to*." *Id.* ("it is not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is 'directed to.'") (quotations omitted).

Here, the patents' common specification explains that the claims are "***directed to*** providing an improved form of user interface that addresses the problems stated" in the Background section, Appx34 (2:28-30) (emphasis added), *i.e.*, "allowing the user" of "computing devices with small screens" to "navigate quickly and efficiently and access data and activate a desired function," particularly in the context of mobile phones with "several different applications," *id.* (1:36-56); not requiring the user to memorize "various keyboard input sequences" to efficiently navigate the device, *id.* (2:5-10); and "effectively

13

enabling the user to understand [the] changing internal state" of the device; and

"how to navigate" to those functions. *Id.* (2:14-25).

The claims at issue here are likewise directed to an improved graphical user

interface that solves the above problems with prior GUIs. Claims 1 of the '020 and

'476 patents are directed to a graphical user interface that allows users to access a

"limited list" of "functions" or "data" for "unlaunched" applications via an

"application summary window that can be reached directly from the main menu,"

whereby the user can "select" any function or data from that limited list in order to

simultaneously "launch" the underlying application and either "initiate the selected

function" or "enable the selected data to be seen." Appx36, Appx44. Claim 11 of

the '020 patent is specifically directed to the small-screen environment of "a

mobile telephone." Appx44. Claim 13 of the '020 patent is directed to providing

the user with a "limited list" of the functionalities offered within the unlaunched

application where the "limited list is a sub-set of all the functions" offered by the

application. *Id.* Claims 8 and 9 of the '476 patent are similar to Claims 11 and 13

of the '020 patent. Appx36.

The claims at issue here are thus directed to providing "a specific

implementation of a solution to a problem in the software arts" and are "not

directed to an abstract idea." *Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339

(Fed. Cir. 2016).

By contrast, LG's attempt to characterize the claims as "the abstract idea of an index" reflects precisely the analytical approach this Court has warned against.

LG's reductionism proceeds in three steps: (1) "the core of the claims . . . is an application summary window," (2) "[t]he purpose of this application summary window is to provide a way in which to access desired content," and (3) therefore, the "core focus of the claims is essentially an index—a list of items that reference desired content." Blue Brief 25.

That reasoning fails because it conflates whether the claims *make use* of an abstract idea, which is irrelevant, with whether the claims are *directed to* an abstract idea, which is the proper inquiry. *Thales*, 2017 WL 914618, at *5. While the claims here may *make use* of an "index" within some conceivable sense of that term, the claims are certainly not *directed to* "an index," as demonstrated above.

Three recent decisions of this Court are particularly instructive here.

In *Enfish*, this Court noted that the patents at issue made use of "an ***indexing*** technique that allows for faster searching of data," 822 F.3d at 1333 (emphasis added)—precisely the characterization of the claims LG urges here. Blue Brief 29 ("At base, the patents address a quicker way of accessing information."). Yet the Court held the claims did not fail *Alice* Step 1 because they were not *directed to* merely "*any* form of storing tabular data," but instead were "specifically directed to a *self-referential* table for a computer database." *Id.* (emphases original).

15

More recently in *Trading Technologies v. CGQ,* this Court conclude that claims drawn to trading commodities on a "graphical user interface" were not directed to an abstract idea. No. 2016-1616, 2017 WL 192716, at *3 (Fed. Cir. Jan. 18, 2017). Because the claims were not directed to merely any graphical user interface, but instead to a "specific, structured graphical user interface . . . addressed to and resolv[ing] a specifically identified problem in the prior state of the art," the Court held they met "the eligibility standards of *Alice* Step 1." *Id.* Thus although the claims made use of the general concept of a graphical user interface, the Court recognized that "the graphical user interface system *of these two patents* is not an idea that has long existed. . . ." *Id.* (emphasis added).

Most recently in *Thales*, this Court again distinguished between identifying an "abstract idea" *underlying* a claim, and identifying what the claim is "*directed to*." 2017 WL 914618, at *5. Although the claims at issue there *made use* of mathematical equations—a traditional "abstract idea"—to determine the relative position of a moving object with respect to a moving reference frame, the Court held they were *directed to* "a new and useful technique for using sensors to more efficiently track an object on a moving platform." *Id.*

LG's argument that the claims here are merely "directed to the abstract idea of an index," Blue Brief 24, fails for the same reasons as in *Enfish*, *Trading Technologies*, and *Thales.* Just as the claims at issue in those cases relied on

storing tabular data, a graphical user interface, and mathematical equations but were not *directed to* those ideas, so too the asserted claims here are not directed to a "menu" or an "index" simply because they may rely on those general concepts.

LG's own arguments before the district court prove as much. Below, LG recognized that the claims are at least "directed to" [1] "displaying" [2] "an application summary window" [3] for "an application" [4] "having a launched/unlaunched distinction" [5] "while the application is in an unlaunched state." Appx4228-30. Such claims are not "directed to an abstract idea." That is precisely why LG now abandons the arguments it made below.

LG's reliance on *Elec. Power Grp. v. Alstom* is likewise unavailing. LG argues that "adding an index is akin to presenting information after collecting and sorting that information," which it asserts *Elec. Power* held to be an abstract idea. Blue Brief 25. That argument again rests on the false premise that the claims here are merely "directed to" an "index." Blue Brief 24. *Elec. Power* did not hold that *any* claim that includes "presenting information after collecting and sorting that information" is an abstract idea, as LG suggests. Blue Brief 25. Rather, *Elec. Power* rests on the Court's finding that the claims at issue there were specifically *directed to* information selection, collection, analysis, and display. 830 F.3d 1350, 1355 (Fed. Cir. 2016). By contrast, the claims at issue here—like those at issue in

17

*Enfish* and *Trading Technologies*—are directed to far more than simple information tabulation and display, as demonstrated above.

Accordingly, in addition to being waived, LG's "index" argument fails on its merits, and the Court's § 101 analysis should end at Step 1. *See Enfish*, 822 F.3d at 1339 ("Because the claim are not directed to an abstract idea under step one of the *Alice* analysis, we do not need to proceed to step two of that analysis.").

## C. The Claims Also Contain Computer-Specific Inventive Concepts.

Claims directed to an "abstract idea" are nonetheless patent eligible where they recite "a sufficient inventive concept under step two—particularly when the claims solve a technology-based problem, even with conventional, generic components, combined in an unconventional manner." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016). LG's § 101 challenge also fails at this step.

The common specification of the patents states that the claims at issue are "***directed to*** providing an improved form of user interface that addresses the problems" of quickly navigating devices with small screens, not needing to memorize shortcut key sequences, and understanding the changing internal state of the computing device. Appx34 (1:36-56, 2:5-10, 2:14-24). Each is entirely computer-specific. Moreover, the claims contain limitations that "make no sense outside the context" of a computing device with a display screen. Appx9562. For

instance, mere indices, in the abstract, do not have an "unlaunched state," and humans cannot mentally perform the process of displaying an "application summary window" while the underlying application(s) "are in an unlaunched state." Nor could a generic index contain "functions" or "data" that are *selectable to launch*" an underlying application and to "enable the selected data to be seen" or "initiate the selected function."

The claims also do not preempt any broad use of indices on computer displays nor merely recite generic computer activity. Rather, they require a computing device to "operate in an unconventional manner to achieve an improvement in computer functionality." *Amdocs*, 841 F.3d at 1300–01. For instance, at the time of the invention, there was nothing "conventional" about displaying an "application summary window" with a "limited list" of functions or data while the underlying "application is in an unlaunched state."

LG's arguments that the claims rely on "conventional computer components" or "general computing elements" to simply show an index on a display screen, Blue Brief 26-27, thus miss the point. As in *Amdocs*, when the claim limitations are considered individually and as an ordered combination, they recite an inventive and unconventional technical solution to a specific technological problem, and their purported reliance on generic computer components does not render them patent ineligible. 841 F.3d at 1301-02. Indeed,

virtually every patent claim directed to computing software must necessarily rely on existing computing hardware components.

LG's § 101 challenge is thus entirely without merit.

## II.    The District Court Correctly Construed "Unlaunched State."

### A.    The Intrinsic Record Fully Supports The District Court's Construction.

Every claim of the asserted patents requires an "application summary window" that is presented to the user "while the application is in an unlaunched state" and from which the user can "launch" that application. *See* Appx44 (Claims 1, 16); Appx36-37 (Claims 1, 11, 20).

There is no dispute that the meaning of "unlaunched state" is informed by, and in opposition to, the meaning of "launch" as used in the patents. Blue Brief 31 (beginning its interpretive analysis with launch); Appx10280:6-7.

And, in the patents' specification, "launch" is always associated with "display." The specification provides: "Once the summary window is *launched*, core data/functionality is *displayed*. . . ." Appx35 (3:10-11) (emphasis added).[2] That usage provides two useful insights. First, the object of the verb "launched" is a graphical user interface component, a "window." Second, the consequence of the action ("launching") is "***to display***" data/functionality to the user.

---

[2] Only one of the patents' substantially identical specifications is cited herein unless otherwise necessary.

The specification likewise teaches that a user can "launch a . . . *view* which *shows* various applications." Appx35(3:5-6) (emphasis added). Again, the focus here is on giving the user ***visual access***, via a GUI feature (a "view"), to functionality on the device ("various applications").

To the same effect, the specification provides that a user can "launch" a "window" (a GUI feature) "for the application of interest" (a functionality). "Once . . . launched, core data/functionality is displayed. . . ." Appx35 (3:6-8).

In all three instances above, the specification teaches that "launching" is a method of visual navigation through a device's GUI. Appx35 (3:3-16) (discussing "advantages in ease and speed of navigation, particularly on small screen devices."). This is not surprising given that the claimed invention is about the user interface as opposed to, for example, the underlying operating system.

The specification also illustrates these concepts through its figures. Once the user has "launched" the application summary window for "Messages" in Figure 1, that application summary window is displayed in Figure 2. Appx33.



**Figure 1**          **Figure 2**

Again, the consequence of "launching" is "to display."

There are no other uses of "launch" within the body of the specification. Thus, each time "launch" is used, it describes an action whereby the computing device *displays* data or functionalities to the user, as the district court correctly found. *See* Appx10280:6-10281:5; Appx12045-46; Appx7-8 (finding that the above passages provided "support . . . for equating 'launched' with 'displayed.'").

The patents' use of "open" provides further support for understanding "launch" to mean "to display." As shown below, the patents equate "launch" with "to open." They also equate "to open" with "to display." They thus equate "launch" with "to display."

Independent claims 1 and 16 of the '020 patent recite that functions in the application summary window are "selectable to launch" the underlying application. Appx36. The specification explains that selecting a function in an application summary window causes the application to "open up." Appx35 (4:2-5) ("when 'Create Messages' in an App Snapshot is selected, then the messaging application is opened up").

Dependent claims 3 and 19 of the '020 patent likewise equate "launching" with "opening." Appx44 (claiming "an application launcher" that allows a selected application "to be opened."). Claims 1, 2, 11, 13, and 20 of the '476 patent use "launch" in the same manner. Appx36-37.

22

The specification further associates the phrase "to open" with words like "display" and "show." Appx36 (5:15-25) ("In the Contacts manager, the App Snapshot **opens** (using whatever mechanism is implemented) ***to display*** phone numbers. . . . It **opens to show** usable contact details like phone numbers. . . .") (emphasis added).

Thus the consequence of "opening," in the context of the patents, is "to display" or "to show," as in "to bring functions and data to the foreground of the display interface." The specification thus further demonstrates that "launch," which is synonymous with "to open," means "to display."

Since the parties agree that "unlaunched state" carries the opposite meaning of "launched," Blue Brief 31, Appx10280:6-7, it follows that an application in an "unlaunched state" is an application that is "not displayed."

That understanding finds contextual support in the specifications' statement of the problem and solution. The specification is directed to the problem of navigating "efficiently" in computing devices with a small screen, which tend to divide data and functionalities into "many layers or views." Appx34 (1:35-43). The invention summary teaches a summary window that "shows data or a function of interest" while saving the user "from navigating to the required application, opening it up, and then navigating within that application" to reach the desired

functionality. Appx34 (2:43-50). The construction "not displayed" makes perfect sense against that context.

### B. LG's Non-Infringement Argument Requires Construing "Unlaunched State" To Mean "Not Running *Code*," Rather Than Simply "Not Running."

As noted above, every claim contains the "unlaunched state" limitation. LG argues that "unlaunched state" should be construed as "not running." But LG avoids explaining what it means by "not running." LG's silence on the matter is critical because the phrase is reasonably susceptible to two significantly different interpretations.

An application may ***simultaneously*** be "running" code in the background of a computing device's display and yet be "not running" in the foreground of the display. Consider a mobile device with Bluetooth. From the moment the phone starts up, the Bluetooth application may constantly be "running code" in the background of the device, both broadcasting itself to other Bluetooth devices and identifying such other devices. But unless the user specifically "launches" the Bluetooth application to see nearby devices or create a data connection, the application will remain "not running in the foreground" even as it actively "runs code" in the background. This dichotomy between "running code" while "not running in the foreground" is a common feature of multitasking "smartphones."

It is clear that LG seeks a construction of "not running" in the sense of "not running code," even in the background. That fact is demonstrated by LG's non-infringement argument. Blue Brief 40-41. LG asserts that if "unlaunched state" means "not running," its devices "cannot infringe" because the accused notifications "are generated by an application that is already running." Blue Brief 40. LG explains this must be true because (allegedly): "the *code* that actually creates the notification is inside the actual application." *Id.* (emphasis added). LG then concludes that since the *code* for sending notifications is in the applications, the notifications purportedly cannot be sent (and LG allegedly cannot infringe) unless the applications are "running." Blue Brief 41. LG's non-infringement theory rests on the premise that an application cannot perform any operation—including sending notifications—unless it is running *code*. *Id.* Thus LG requires and requests a construction of "not running" in the sense of "not running code," even in the background.

By contrast, LG does not seek a construction of "not running" that encompasses "not running in the foreground." That construction would be consistent with the district court's construction of "not displayed." It would also not support LG's non-infringement argument. An application that is "not running in the foreground" *could* send notifications to the operating system if it is "running code" in the background.

The distinction between "not running code" and "not running in the foreground" is thus critical for two reasons.

First, as demonstrated in Section II.A above and II.C below, a construction amounting to "not running code" is entirely inconsistent with the specification.

Second, although the prosecution history admittedly contrasts "unlaunched" with the term "running" at times, it makes clear that, in each instance, "running" is used in the sense of "running in the foreground," and not "running code." Section II.D, below, demonstrates that fact.

The prosecution history thus further supports the district court's construction, and provides no basis for finding that the patentee disclaimed "not displayed" from the scope of "unlaunched state," as shown in Section II.E.

### C.    LG's Proposed Construction of "Not Running *Code*" Would Exclude The Specification's Preferred Embodiments, And Clash With Several Claims, Which Teach That Applications May Remain "Unlaunched" Yet Be "Running Code."

As shown above, LG seeks a construction that "unlaunched state" means "not running *code*," *even in the background*. *See* Section II.B, *supra*; Blue Brief 40-41. But the patents' specification, including Figure 3, expressly teaches that the "application summary window" *can* display functions or data for an application while that application *is running code*.

Figure 3 of the patent illustrates an application summary window[3] for the

Messages application, showing that the application has "1 Chat *ongoing*." Appx33

(emphasis added).



The specification explains that arrow 4 is meant to highlight that

functionality. Appx35 (3:46-48) ("In FIG. 3, a slightly longer App Snapshot is

shown, indicating at **4** that there are '2 new SMS' messages and '1 Chat

Ongoing.'").

Figure 3 is critical because it shows that the underlying Messages

application *must be running code* in the background when the application

summary window displays the data regarding that application, *i.e.*, "1 Chat

*ongoing*." There is simply no other possibility: an application cannot have

"ongoing" operations if it is "not running code." Thus if "unlaunched state" were

_____

[3] LG agrees the App Snapshot is an "application summary window." Blue
Brief 33.

to mean "not running code," as LG seeks, Blue Brief 40-41, Figure 3 would fall outside the scope of every claim of both patents. Such a result would directly contradict the specification, which states that Figure 3 "show[s] an implementation *of the present invention*." Appx34 (2:61-62) (emphasis added).

Construing "unlaunched state" to mean "not running code" would likewise exclude a second preferred embodiment from the scope of every claim. The specification teaches that "[t]he App Snapshot can [ ] display data *from an application* . . . without actually opening the application up. . . ." Appx35 (3:64-4:2) (emphasis added).

In order for an application summary window to display data *from an application*, that application must necessarily be "running code." Again, there can be no data *from* an application that is "not running code." LG itself stresses that fact. Blue Brief 41 ("Because the application generates the notification . . ., it follows that the application must be running when the notification pops up.").

Yet if "unlaunched state" were construed to mean "not running code," then an application summary window displaying data *from an application*—a preferred embodiment—would also fall outside the scope of all claims. That is, in fact, precisely what LG hopes to achieve. Section II.B, *supra*.

Thus construing "unlaunched state" to mean "not running" (including running code) would be in direct opposition to two preferred embodiments: Figure 3 and displaying data *from* applications that remain *unlaunched*.

This Court has repeatedly held that a claim construction "that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007).

Because a construction of "not running *code*" would exclude those preferred embodiments from the scope of the patents' claims—including the lead independent claims—that construction is wrong. *Id.* (rejecting a claim construction that would exclude embodiments shown in the figures); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) (same); *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC,* 445 F.3d 1348, 1353–55 (Fed. Cir. 2006) (same); *Vanderlande Industries Nederland BV v. Int'l Trade Comm'n,* 366 F.3d 1311, 1320, 1322 (Fed. Cir. 2004) (declining to limit the term "glide surface" to a specific embodiment where the descriptive text included other embodiments). And as demonstrated in Section II.E below, there is no evidence that either of the above preferred embodiments was disclaimed or subject to prosecution history estoppel. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1311 (Fed. Cir. 2014) (reversing claim construction "that would exclude the Figure 7 embodiment"

where there were "no statements during prosecution or in the specification that indicate[d] the patentee's intent to limit his claim" to exclude that embodiment).

A construction of "not running" in the sense of "not running code" would also conflict with several dependent claims. Claim 6 of the '020 patent and Claim 5 of the '476 patent both recite that the data types and/or functionality displayed "for a given application *varies* with the *environment* of the device." Appx44, Appx36 (emphasis added). The specification teaches an embodiment in which the summary window for a "Bluetooth application" "lists the other Bluetooth devices in the vicinity." Appx43 (4:47-52). In order for the application summary window to display data from the "Bluetooth application" regarding "Bluetooth devices in the vicinity," the Bluetooth application *must* be "running code."

Dependent Claim 10 of the '020 patent, which requires that "the summary window further display a list of data *stored in* that application," provides further support. Appx44 (emphasis added). For the summary window to display data stored in the underlying application, the application must be running code.

Moreover, several of the patents' claims recite both "running code" and "unlaunched state" in the same claim, and thus demonstrate that the patentee did not use the unique and distinct phrase "unlaunched state" to mean "not running code." *See* Appx44-45 (Claims 16 through 27), Appx36-37 (Claims 11 through 18 of the '476 patent) (reciting "a computer-readable storage medium having

computer-readable *code* embodied in the medium which, ***when running*** on a computing device, causes the computing device to" perform various steps while the application is in an "unlaunched state") (emphasis added).

The district court's construction is consistent with the patents' preferred embodiments and claims. Once "unlaunched state" is understood to mean "not displayed," an application summary window may show that the Messages application has an "ongoing" chat, and may receive data *from* that application, "without actually opening the application up," Appx35 (3:64-4:2), *i.e.*, while that application remains in an "unlaunched state."

### D.    The Prosecution History Only Uses "Running" To Mean "Running In The Foreground," And Not "Running Code."

LG's arguments do not address any of the powerful specification evidence discussed in Sections II.A and II.C above, which teach against "not running code."

LG instead principally relies on statements in the prosecution history discussing "running" and "launch." Blue Brief 33-37.

It is true that the prosecution history at times contrasts "unlaunched" with "running." But as demonstrated in detail below, in each instance "running" was used to mean "running in the foreground," and not "running code." The prosecution history thus does not support a construction of "not running" in the sense of "not running *code*," as LG seeks. *See* Section II.B, *supra.*

31

During prosecution, the patentee added the limitation "unlaunched state."

Appx12758. The patentee explained that "unlaunched state" means "that the

application summary window is displayed without launching the application."

Appx12765. It tied that concept to the invention's "underlying purpose" of

"provid[ing] the user with a shortcut to functions within an application *directly*

*from the main menu*." *Id.* (emphasis added). It then stated that underlying purpose

could not be achieved by displaying an application summary window "*after* the

application *is already running*." *Id.* (emphases added). It described one example of

a "running" application as an application that "has finished loading in its default

(and perhaps undesired) state." *Id.* It then explained that an "application summary

window" cannot allow a user to "shortcut to functions within [an underlying]

application *directly from the main menu*"—the underlying purpose of

"unlaunched state"—if the application itself is "already running." *Id.* That is

because, once the application itself is "already running," the user is instead

"forc[ed] to hunt for the function in the interface" of the application itself, rather

than "launch an application in such a way that it is initiated to directly perform one

of the common functions." *Id*.

With that explanation, the patentee distinguished the prior art, including

*Richard*, as unable to achieve "[t]he benefit of the claimed invention" because

"[t]he menu described in *Richard* relates to open windows in a *running* application

and likewise the menus in *Arcuri* and *Capps* relate to functions of a *running* application." *Id.* In other words, the prior art only taught a menu displayed to the user *within the interface of the underlying application itself*, rather than from a separate interface while the underlying application remains "unlaunched" or not displayed. *Id.* Nothing in the prosecution history addressed an application running code but not running in the foreground.

The patentee thus used "running" in this context to mean "running in the foreground of the device," *i.e.*, launched or displayed. This is further illustrated by the fact that the alternative possibility of "running" in the sense of "running code" would not support the patentee's stated distinction. As noted, the patentee stated that it is not possible to "shortcut to functions within an application directly from the main menu" if "the application is already running." *Id.* But a user *can* "shortcut to functions directly from the main menu" even if an application is "already running *code*." Figure 3 is again illustrative.



Figure 3

In Figure 3, the underlying Messages application is already running code because it has "1 Chat *ongoing*." Appx33. But despite the fact that the Messages application is "already running *code*," Figure 3 shows that the user *can* select "1 Chat ongoing" and thereby "shortcut" to the ongoing chat in the Messages application "directly from the main menu." *Compare* Appx12765 *with* Fig. 3. The fact that the Messages application is "already running *code*" does not "force" the user "to hunt for the function *in the interface* [of the Messages] application." *Id.* (emphasis added).

The same is true with respect to another statement by the patentee, one page earlier in the prosecution history, in which it distinguished *Richard* on the basis that the application in that reference "must be running and therefore has been launched." Appx12764. That statement again used "running" in the sense of "running in the foreground," and not "running code."

The patentee explained that, contrary to the examiner's assertion, Figure 6 of *Richard* did not teach "a main menu" listing "one or more *applications*." *Id.* Rather, the menu depicted by item 510 in *Richard* "correspond[ed] to *open* windows within a single application." *Id.* (emphasis original). The patentee explained that items 512, 514, and 516 within the menu 510 are not separate applications—as the examiner had asserted—but instead are windows within a *single* application, "APP B." *Id.* (citing *Richard* column 3, lines 20-44). It further

observed that windows 512, 514, and 516 are "*open* windows." *Id.* It then

concluded: "It follows from the fact that the windows," *i.e.*, the windows shown in

menu 510, "are open ***within the application*** that the application must be running

and therefore has been launched." *Id.* (emphasis added). In other words, the

patentee again distinguished *Richard* as only teaching a menu displayed *within* an

application itself, rather than a "main menu" outside an application from which a

user can "shortcut" directly to specific functions of an "unlaunched" application.

Since the windows in *Richard* appear within a menu (item 510) that is part of APP

B itself, it necessarily follows that menu 510 displays an aspect of APP B. In short,

*Richard* shows a user interacting with a menu (item 510) *within* APP B, and thus at

that moment APP B itself is displayed or "launched" or "running" in the sense of

"running in the foreground."

The district court correctly interpreted the above discussion of *Richard* in the

same manner. Appx7-8 ("the patentee argued that Richard only discloses a single

launched and visible application consisting of multiple windows.").

The patentee's prosecution history statements regarding another reference,

*Arcuri*, further support interpreting the patentee's use of "running" to mean

"running in the foreground." In distinguishing *Arcuri*, the patentee argued that the

"menu" in that reference is "a view menu *within* a word processing program," *i.e.*,

within the underlying application itself. Appx12764 (citing *Arcuri* col. 8 lines 10-

12). On that basis, the patentee argued that the menu in *Arcuri* is "only ever displayed within a *running* instance of the program, i.e., only when the program is in a *launched* state." *Id.* (emphasis original). Thus once again, *Arcuri* displayed a menu *within* the underlying application itself, and so the word processing application itself was also "launched," *i.e.*, displayed or "running in the foreground." That understanding relates back to the patentee's statement that "unlaunched state" means "that the application summary window is displayed without launching the application." Appx12765.

The above discussion addresses every instance in which the prosecution history uses "running" in the context of "unlaunched state" to distinguish prior art. As demonstrated, in each instance the patentee distinguished the prior art for failing to teach a menu from which a user can launch certain functionalities or data of an application while the application itself is "not running" in the sense of "not running in the foreground of the display."

Accordingly, the prosecution history does not support a construction of "not running" in the sense of "not running *code*," as LG seeks. *See* Section II.B, *supra*. Rather, it only further supports a construction of "not displayed." Appx7-8.

### E.    The Prosecution History Thus Provides No "Clear And Unmistakable Disclaimer" Of "Not Displayed."

LG heavily argues the patentee disclaimed "not displayed" from the scope of "unlaunched state" via the prosecution statements discussed above. Blue Brief 33-37. But the prosecution history provides no basis for finding disclaimer.

As an initial matter, the prosecution history provides no support for finding a conflict between "unlaunched state" and "not displayed." Section II.D, *supra*. That is fatal because disclaimer cannot be found absent "disavowing actions or statements" that are "both clear and unmistakable." *Avid Tech., Inc.*, v. *Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016).

Moreover, during prosecution the patentee specifically pointed to page 5, lines 1-30 of the application as support for the "unlaunched state" limitation. Appx12915. That passage contains both the specification's discussion of Figure 3 and the teaching that the application summary window "can [ ] display data *from* an application . . . without actually opening the application up. . . ." *Compare* Appx12578 *with* Appx35 (3:46-48, 3:64-4:2). The patentee thus did not disclaim "not displayed" by adding "unlaunched state." *See* Section II.C, *supra*.

And while LG may argue that some uses of "not running" in the prosecution history, viewed without context, appear ambiguous as between "not displayed" and "not running code," that is insufficient for disclaimer. *See Tech. Properties Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349 (Fed. Cir. 2017) ("If the challenged

37

statements are ambiguous or amenable to multiple reasonable interpretations, prosecution disclaimer is not established."); *Oatey*, 514 F.3d at 1277; *GE Lighting Sols.*, 750 F.3d at 1311.

There is no evidence, much less unmistakable evidence, of a disclaimer of applications that are running code in the background but not displayed. And the prosecution statements LG relies upon are, at a minimum, amenable to multiple reasonable interpretations. Section II.D*, supra*. There is thus no basis to find that the patentee disclaimed "not displayed" from "unlaunched state."

### F.    LG's Claim Construction Arguments Do Not Show Error.

LG presents five arguments in support of its claim construction position. Each is addressed in turn below.

*LG Arg. 1: "The plain meaning of ['unlaunched state'] is 'not running.'" Blue Brief 20, 31.*

LG cites to three dictionaries for the proposition that the plain meaning of "launch" is "to put into operation or set in motion," "to load into a computer's memory and run," or "to start a computer program." Blue Brief 31. LG's dictionary-based arguments should be rejected as waived and unavailing.

LG provides no citation to the record below for two cited technical dictionaries. Blue Brief 31; *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1346 (Fed. Cir. 2003) (this Court "will rarely give weight to arguments that rely on sources brought forth for the first time on

appeal."). Moreover, LG's reliance on the Merriam-Webster dictionary—raised for the first time in its Rule 50(b) motion—is also untimely. Appx9. LG's arguments based on all three dictionaries should thus not be considered.

And while the Court may consult dictionaries *sua sponte*, *Boehringer*, 320 F.3d at 1346, it certainly should not consider dictionaries *before* the intrinsic record, as LG does. Blue Brief 31; *Phillips v. AWH*, 415 F.3d 1303, 1322-32 (Fed. Cir. 2005).

The Court also should not rely on dictionary definitions that "contradict any definition found in or ascertained by a reading of the patent documents." *Id.* As demonstrated above, an understanding of "launch" that is limited to "running code" would exclude two preferred embodiments from the scope of every claim and would be inconsistent with numerous aspects of the specification, the language of the claims themselves, and the prosecution history. *See* Section II.C & D; *Logan v. Hormel Foods, Inc.*, 217 F. Appx. 942, 944 (Fed. Cir. 2007) (rejecting "numerous dictionary definitions" as "inconsistent with the intrinsic record and therefore, [ ] not probative.").

To the extent the Court considers dictionary definitions, however, it will find that contemporaneous technical dictionaries define "launch" as "***to activate . . . from the . . . user interface***," *i.e.*, to display. *Microsoft Computer Dictionary* (5th

ed. 2002) ("To activate an application program (especially on the Macintosh) from the operating system user interface").

> ***LG Arg. 2:*** *"Launch" cannot mean "display" because "both are 'expressly recited' in the claims." Blue Brief 32.*

LG argues that the claims use both the terms "launch" and "display" and this fact compels or at least "indicates" that "launch" cannot mean "display," citing three cases. Blue Brief 31-32.

That argument is unpersuasive because both patents also repeatedly recite "code . . . running" in the same claim as "launch" and "unlaunched state." *See* Appx44-45 (Claims 16 through 27 of the '020 patent), Appx36-37 (Claims 11 through 18 of the '476 patent); *see also* Section II.C, *supra*.

Moreover, each of LG's citations is inapposite. Unlike in *Primos*, construing "unlaunched state" to mean "not displayed" does not render any existing claim language "superfluous" because "not displayed" does not otherwise appear in any of the claims. *Cf. Primos, Inc. v. Hunter's Specialities, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006). And unlike in *Primos*, interpreting "unlaunched state" to mean "not displayed" would not "exclude the embodiment shown in [a] figure" or be inconsistent "with the rest of the specification." *Id.* Rather, it is LG's proposed construction of "not running code" that gives rise to such fundamental problems. *See* Section II.C, *supra*.

The decisions in *Chi. Bd. Options Exch.* and *CAE Screenplates* likewise only further support the district court's construction, and do not aid LG. Both cases held that "*in the absence of any evidence to the contrary*, we must presume that the use of different terms in the claims connotes different meanings." *Chi. Bd. Options Exch. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (finding that "[n]othing in the patent suggests that 'storing' and 'applying' are used interchangeably") (quoting *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000)) (emphasis added). Here, there is significant evidence in the patent and the prosecution history that "launch" connotes "display" and that "unlaunched state" means "not displayed." *See* Sections II; Appx7-8. By contrast, there is no evidence in the patent or its prosecution history that "launch" means "running" in the narrow sense of "running code" or that "unlaunched state" means "not running *code*." *Id.*

> **LG Arg. 3:** *"[C]onstruing 'launch' to mean 'display' . . . would fundamentally alter the meaning and character of the claim." Blue Brief 32.*

LG argues that if "launch" means "display," then the claims would require that "the list of data must be selectable to 'display' the respective application, not make the application run," which it claims would change the "meaning," "character," and "purpose" of the claims. Blue Brief 32. That argument fails on three levels.

*First*, LG's argument presents a false dichotomy between "display" and "run." For an application to be "displayed," it must both be (1) running code and (2) running in the foreground. The former is necessary, but only the latter is sufficient. Thus if "launch" means "display," launching an application will necessarily make it run. By contrast, in order for an application to be "not displayed," it is sufficient that the application be "not running in the foreground," and it is not necessary that it be "not running code."

*Second*, construing "unlaunched state" to mean "not displayed" is entirely consistent with the claims. A construction of "not displayed" allows the claims "to save 'the user from navigating to the required application, opening it up, and then navigating within that application to' reach the data or function." *See* Sections II.C & D (discussing Fig. 3 and that the prior art menus were only accessible from within the underlying applications). By contrast, the "not running *code*" construction LG seeks, Section II.B, *supra*, would exclude preferred embodiments from the claims, clash with several claims, contradict the specification, and render the patentee's distinctions over the prior art meaningless. Section II.C, *supra*.

LG also argues that the specification teaches that "launch" means "opened or running." Blue Brief 33. It does not do so in the sense of "running *code*," which is the relevant inquiry. *See* Section II.B, *supra*. While the specification supports interpreting "launch" to mean to open, it also shows that "to open" means "to

42

display." Section II.A. By contrast, the specification provides no support for

equating "unlaunched state" with "not running *code*" even in the background.

Sections II.B & C, *supra*. LG's own specification quotation illustrates both points:

an application summary window "can [ ] display data *from* an application and

functions of that application without actually opening the application up," *i.e.*,

without displaying the underlying application, but an application summary window

**cannot** do so without the underlying application actually running code. *See* Blue

Brief 33; Section II.C, *supra*.

> **LG Arg. 4:** *"Core disavowed the 'not displayed' construction during prosecution to distinguish prior art" or else "that prosecution history reinforces" construing "unlaunched state" as "not running." Blue Brief 20, 33-37.*

As shown in Section II.E, *supra*, there is no disavowal here. The patentee

distinguished *Richard* and other prior art because they only taught menus *within*

the underlying applications, and thus only taught "launched" applications, *i.e.*,

applications displayed (or "running") in the foreground of the device. Section II.D,

*supra*.

That reality defeats LG's principal argument on two levels.

*First*, since there is no disavowal of "not displayed," the district court's

construction does not "recapture" disavowed claim scope.

*Second*, it demonstrates that the patentee used "running" in the sense of

"display," *i.e.* "running in the foreground of the display device," and so a

construction of "not running"—without further limitation—would not provide any basis to disturb the verdict. Section II.B.

LG also argues that in Figure 6 of *Richard* "the application summary window for App. B is displayed while App. B is *not* visible (i.e., not displayed)," and so construing "unlaunched state" to mean "not displayed" would not distinguish the claimed invention from *Richard*. Blue Brief 35.

That is false. In Figure 6 of *Richard*, the menu 510 is shown *within* an instance of the App. B application, and thus App. B itself is visible as well.



Appx14459 (annotated red box showing App. B). Because the menu 510 is a menu *within* AppB, AppB itself is visible and displayed in the foreground for user

interaction in Figure 6, and is thus *not* in an "unlaunched state." Appx14462 at 3:34-37; *see also* Appx12747 (stating that "Figure 6 of Richard . . . . **shows** two *open applications* (AppA and AppB). . . .") (emphasis on "shows" added); Section II.D, *supra* (discussing Appx12764-65). The district court recognized the same. Appx7-8.

Thus a construction of "unlaunched state" as "not displayed" is the very basis on which the patentee distinguished *Richard*, and the district court correctly found that this is at least a "reasonable interpretation of the prosecution history." Appx8-9 (gathering authorities).

For the same reasons, the prosecution history does not support construing "unlaunched state" to mean "not running *code*" as LG seeks. *See* Sections II. B & D-E, *supra*.[4]

> **LG Arg. 5:** *"[T]he district court ignored LG's" argument that "launched" and "displayed" must have different meanings and otherwise erred. Blue Brief 37-39.*

LG rehashes many of its arguments under the guise that the district court either ignored its points or otherwise erred. Each of LG's criticisms is wrong.

---

[4]    The distinctions in this brief between "running in the foreground of the display" and "running code" are not "new" claim construction arguments and have not been waived. *D'Agostino v. MasterCard Int'l Inc.*, 844 F.3d 945, 950 (Fed. Cir. 2016) (citing *Interactive Gift Express v. Compuserve Inc.,* 256 F.3d 1323, 1346 (Fed. Cir. 2001)); *Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1003 (Fed. Cir. 2014) (citing same). Our arguments do not seek to change the scope or meaning of "not displayed." *Id.*; *see* Sections II.B-E, *supra*.

*First*, the district court recognized that "LG briefly mentioned" that launched and displayed both appear in the claims and so must have different meanings. The court also cited to the five lines of transcript containing the entirety of LG's argument on this point. Appx6. It did not find the argument persuasive, and was not required to elaborate further, particularly as this Court's review on the issue is *de novo* and LG's argument is without merit. *See* Section III.E, *supra* (LG Arg. 2).

*Second*, LG claims the district court ignored "other aspects of the specification" that support its position, Blue Brief 39, but LG never raised any specification-based arguments before the district court. *Compare* Blue Brief Part II.A.1 & Appx43 (3:53-60) *with* Appx10284-90 (*O2 Micro* hearing) *and* Appx11100-05 (Rule 50(b) motion) (making a single argument based on the claims and otherwise focusing entirely on prosecution history). Accordingly, the district court did not "ignore" any specification-based arguments. Indeed, the district court "carefully consider[ ] the specifications" in reaching its decision. Appx7. LG chose not to make specification-based arguments below because it knew the specification only refutes its request to exclude "not displayed" from the claims.

*Third*, LG argued below for a construction of "not running" that specifically excluded "not visible" and was thus limited to "not running code." *See* Appx10288:15-22; Section II.B & C, *supra*. The court properly found that the prosecution history did not provide a basis for narrowing the scope of the claims

46

(*i.e.*, restricting "unlaunched state" to "not running code") and thus properly rejected LG's request. Appx7-8.

## III.   Construing "Unlaunched State" To Mean "Not Running" In Either Sense Of The Phrase Would Not Warrant Reversal.

LG does not challenge the sufficiency of the evidence supporting the jury's infringement verdict if "unlaunched state" means "not displayed." Indeed, LG's own expert admitted at trial that its accused devices meet the "unlaunched state" limitation. Appx10662:1-24. A construction of "not running"—absent further limitation—would encompass "not displayed," *i.e.*, "not running in the foreground of the device's display." Section II.B, *supra*. Accordingly, there would be no basis to disturb the verdict if "unlaunched state" were simply construed as "not running." *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, No. 2015-1992, 2017 WL 900016, at *5 (Fed. Cir. Mar. 7, 2017) ("We may affirm the jury's findings on infringement if substantial evidence appears in the record supporting the jury's verdict, and if correction of errors in claim construction would not have changed the verdict, given the evidence presented.") (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002)).

Moreover, even a construction limiting "unlaunched state" to "not running code" would not support reversal on this record. To "reverse a district court's denial of JMOL without a remand" based on a different claim construction, this Court must first conclude that "no reasonable jury could have found infringement

47

under the proper claim construction." *Finisair Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1333 (Fed. Cir. 2008).

Here, LG has not presented any record evidence to establish that no reasonable jury could find infringement if "unlaunched state" means "not running code."

LG's non-infringement argument rests on the factual assertion that "the code that actually creates the notification is inside the actual application." Blue Brief 40-41. In support, LG cites to two pages of deposition testimony from a Google engineer. *Id.* (citing Appx10573 and Appx10578).

Neither passage establishes that no reasonable jury could find infringement of the asserted claims if "unlaunched state" were to mean "not running code."

In the first passage, the deponent testified that (1) there is code in the *operating system* "that handles all notifications," and (2) "[t]he code that creates a Gmail notification would be inside Gmail." Appx10573:15-24. It does not strictly and exclusively follow, however, that LG's accused devices would not provide *any* notifications as to either "data" or "functions" that are "offered within" *any* applications if the underlying applications themselves are not running code. Rather, since the code "that handles all notifications" is in the operating system, and not in each individual application, it remains entirely possible that the devices are "configured to" be able to provide notifications for "data" or "at least one

48

function offered within" at least one application even if the application is not running code. *See* Appx36 (Claim 1); Appx44 (Claim 1). Notably, the claims do not require that an application itself send data or functionality to the application summary window—they simply cover such a scenario within their broader scope.

The second passage is to the same effect. That passage again states that *if* the notification in question is sent by an underlying application, the content of the notification "is expressed in code in the application itself." Appx10578:6-25. It does not follow, however, that all notifications of "data" or "at least one function offered within" every application on the accused devices *must* be sent by the underlying application itself. That factual question remains unanswered.

And while LG argues that "Core presented no evidence" of infringement under a "not running code" construction, Blue Brief 41, Core was not required to do so, and had no reason to do so, under the district court's construction. The issue was simply not subjected to factual exploration at trial. *But see* Appx14452.

Thus if the Court construes "unlaunched state" to mean "not running *code*," which it should not, Section II, *supra*, the Court should remand for further factual development, not reverse.

## IV.  The Jury Fully Considered LG's Non-Infringement Arguments As To "Reached Directly," And Substantial Evidence Supports The Verdict.

Core's expert, Dr. Zeger, provided extensive testimony at trial showing that LG's accused devices infringe the "reached directly" limitation of the asserted

claims under the district court's claim construction. Appx10231:5-22,

Appx10233:23-10235:4, Appx10253:13-10254:15, Appx10263:8-10264:1,

Appx10270:8-10271:1, Appx10311:21-10313:4, Appx10327:12-10328:1. That

testimony alone provides substantial evidence to support the verdict, and precludes

LG's request for judgment of non-infringement.

In addition, testimony from LG's expert, Dr. Rhyne, only further supports

the verdict. Dr. Rhyne agreed at trial that reaching the notification shade from the

devices' home screen (which he admitted is the "main menu") requires "no

intervening steps; it's a single step to get that shade down." Appx10663:7-22. Dr.

Rhyne also agreed that if the jury found that the status bar is part of the home

screen, LG's devices would meet the "reached directly" limitation. Appx10669:14-

18. He then admitted that LG's own user manuals describe the "status bar" as part

of the "home screen" display. *See* Appx12050-51 (gathering citations). The jury

focused on that evidence and requested to examine those manuals during its

deliberation. *Id.* Based on the evidence before it, including Dr. Rhyne's testimony,

the jury rejected LG's argument that "the status bar is not part of the main menu"

and found infringement. *Id.* (gathering citations). Substantial evidence supports

that verdict. *See* Appx10-12.

As shown below, none of LG's arguments demonstrates otherwise.

### A.    LG's New Claim Construction Request Is Waived, Judicially Estopped, Subject To "Extreme Disfavor," And Simply Wrong.

LG begins by arguing that the district court's construction should have included a *further* limitation. Blue Brief 42. LG then launches into an analysis of the specification and prosecution history, and even argues claim scope disavowal. *Id.* at 43.

 "A party may not introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below." *TVIIM, LLC v. McAfee, Inc.*, No. 2016-1562, 2017 WL 1056113, at *4 (Fed. Cir. Mar. 21, 2017) (quotations omitted). "Moreover, litigants waive their right to present new claim construction disputes if they are raised for the first time after trial [and]  . . . . cannot be allowed to create a new claim construction dispute following the close of the jury trial." *Id.*

LG did not seek an "interacting with the main menu" limitation during the *O2 Micro* hearing. Appx8-9 & n. 2-3. It also did not seek that limitation in its Rule 50(a) motions. *Id.* Accordingly, LG has waived this claim construction request. *TVIIM*, 2017 WL 1056113, at *4; Appx8-9 & n. 1-3.

LG's claim construction request is also barred by judicial estoppel. "The doctrine provides that a party will be judicially estopped from asserting a position on appeal that is directly opposed to a position that the party successfully urged at trial." *Interactive Gift Express v. Compuserve Inc.,* 256 F.3d 1323, 1345 (Fed. Cir.

2001). In the context of claim construction arguments, the doctrine precludes a party "from changing its claim construction position on appeal from any position that it successfully advanced at the district court." *Id.* at 1349.

During the *O2 Micro* hearing, LG argued that the correct construction of "reached directly" is "reached without an intervening step." Appx8. The district court adopted LG's proposed construction. *Id.* LG now seeks to change its claim construction position on appeal, and judicial estoppel thus applies. *Interactive Gift Express*, 256 F.3d at 1345.

Indeed, LG's request for a new limitation to its own claim construction is in *direct opposition* to its successful argument before the district court that (1) the correct construction of "reached directly" is "without an intervening step," and (2) that LG was "not trying to argue . . . that the patent ***specifies some particular way of doing that***." Appx10294:19-22 (emphasis added), Appx10297:2-5 ("the construction we would like on 'reached directly' is 'without an intervening step.'"); *see* Appx9 n. 1 ("The Court notes that LG now attempts to challenge the precise claim construction for 'reached directly' which LG requested and received when the Court construed this term."). LG is thus estopped from now seeking to further limit the claims with a "particular way" of accessing the main menu. *Interactive Gift Express*, 256 F.3d at 1345.

This Court has also noted, aside from the doctrine of judicial estoppel, that it "look[s] with extreme disfavor on appeals that allege error in claim constructions that were advocated below by the very party now challenging them." *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000).

LG's waived and estopped claim construction request is also simply wrong. LG's argument rests on the premise that the claim limitation's use of the preposition "from" compels "interacting with" the main menu. Blue Brief 42. But as Dr. Zeger explained at trial, that premise is false: an application summary window is also "reached directly *from* the main menu" when the user accesses the summary window while observing the main menu. Appx10317:14-24, Appx10318:16-10319:1, Appx10321:24-10322:5. There is thus no basis for limiting the claims to a "particular way" of reaching directly from the main menu.

Indeed, the specification of the patents directly teaches against such a limitation. The specification provides that an example of a "main menu" or "main view" is the Application Launcher of Figure 1. Appx35 (3:17-28). It further teaches that "when the Application Launcher is opened the highlighting *defaults* to the first item in the list of applications." *Id.* (3:23-28) (emphasis added). From there, "should the highlight ***rest*** on the name of an application in the App Launcher for a certain amount of time (say a 1.2 second timeout), the summary window (the "App Snapshot") ***drops down from the highlight bar***." *Id.* (3:34-38) (emphasis

53

added). In other words, the user need not do ***anything at all*** in order to directly reach the application summary window for an application *from* the main menu— the user can, for instance, simply allow a summary window to *automatically* open for the first application in the list of applications. LG's construction is therefore wrong. And LG's citation to another embodiment, Blue Brief 43, cannot support limiting the claims to exclude the embodiment outlined above.

Moreover, accepting LG's claim construction request would not support either reversal or remand. As demonstrated at trial, the status bar is part of the main menu. *See* Section IV, *supra* (collecting record citations). When the user swipes down to access the notification shade, it is necessarily "interacting with" the status bar, and is thus "interacting with the main menu." LG admits this point. *See* Blue Brief 44 ("The accused notifications are reached by interacting with the status bar."). LG's construction request is thus also irrelevant.

### B.    LG's Re-Hashed Factual Disputes Are Still Unavailing.

To obtain a judgment of non-infringement on appeal, LG must show that, "when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of [LG] that . . . reasonable jurors could not arrive at any contrary conclusion." *Wi-Lan*, 811 F.3d at 461 (quotations omitted). LG's arguments do not meet that heavy burden, but either re-urge the

factual disputes the jury fully heard and rightly resolved against LG, or else raise new arguments that are waived.

The central premise of LG's non-infringement argument is, once again, that "the status bar is not part of the main menu." Blue Brief 2, 21, 46. Powerful impeachment evidence at trial permitted a reasonable jury to find otherwise. Appx10667:16-10669:12 (LG's expert admitting that LG's user manual defines the "home screen" as including the "status bar"); *see* Appx12050-51 (gathering citations); Appx12 (district court emphasizing this testimony).

Despite the admission of its own expert based on the statements in its own manuals about its own accused products, LG nonetheless tries to prove on appeal that the status bar cannot be considered part of the main menu. Each attempt is addressed below.

LG argues that users of its accused products can reach the status bar from applications as well as the home screen, Blue Brief 44-46, and thus "the screen being displayed is irrelevant to whether the user can reach the notification shade." *Id*. That is simply beside the point, however, and is not a non-infringement argument. *See* Appx12052. And to the extent LG's argument even identifies a factual dispute that could support non-infringement, Dr. Zeger and Dr. Rhyne's testimony gave the jury an abundant evidentiary basis to find for Core. *See* Section IV, *supra* (collecting evidence).

LG's citations to the testimony of a Google engineer, Blue Brief 46, also fail for the same reasons. *See* Appx12051.

LG argues that the figures in the asserted patents "show that the status bar is not part of the main menu." That argument employs deliberate false logic. The relevant issue is whether the "status bar" in LG's devices is part of the home screen, and thus part of the "main menu" defined by the infringement contentions for purposes of the infringement analysis. The figures in the asserted patents cannot answer that factual question in the negative. That is particularly true since LG's own expert admitted the figures are not limiting. Appx12052 (citing testimony). LG's reliance on the inventor's statements fails for the same reasons. Blue Brief 46.

LG also attempts to downplay the weight that should be given to the statements in its user manuals and to Dr. Rhyne's testimony, and argues for alternative interpretations of that evidence. Blue Brief 47-48. But weighing the evidence and interpreting its import is for the jury, and this Court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." Appx2-3 (quoting *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013), and setting forth JMOL standard); Appx12 (refusing to "supplant the judgment of the jury"); *Wi-Lan*, 811 F.3d at 461.

In attempting to spin the evidence, LG specifically argues that there are two senses "to home screen" within the context of its devices, and that the jury conflated these senses. Blue Brief 47-48. LG does not explain, however, how this point supports a finding of non-infringement in light of the totality of the evidence, and the point is thus irrelevant. *See* Appx12433. As noted, Dr. Zeger's testimony alone supports the verdict. *See* Section IV, *supra*. Moreover, LG never made this argument in its Rule 50(a) motion, and it is thus waived. *See* Appx9852-76.

Finally, LG claims it is not enough for the user to simply "see" the main menu at the time it reaches the application summary window. Blue Brief 45. As explained, that assertion fails on numerous grounds. *See* Section IV.A, *supra*.

Accordingly, there is no basis to enter judgment of non-infringement here.

## V.    LG Did Not Prove *Blanchard* Anticipates, As The Jury Rightly Found.

This Court "will overturn the jury's verdict only if the evidence points so strongly and overwhelmingly in favor of anticipation that no reasonable jury could have returned the jury's verdict of no anticipation." *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 510 (Fed. Cir. 2016) (citations omitted); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1293 (Fed. Cir. 2015).

**A.  LG's Own Evidence Proved *Blanchard* Does Not Teach A "*Limited*" List.**

All of the asserted claims require that the application summary window offer "a *limited* list" of either the functions or data offered by the underlying application.

LG's anticipation evidence as to that limitation relied entirely on Figure 3 of *Blanchard*. Appx10633-34, Appx10637, Appx10639, Appx10641. LG's expert, Dr. Rhyne, testified that Figure 3 "is a flowchart of the way the menus that are provided" in *Blanchard* "can be accessed." Appx10621. *Blanchard* Figure 3 is shown below. Appx13095.



Claim 1 of the '020 patent requires a "limited list" of functions, rather than data. Appx44. Addressing that claim, Dr. Rhyne testified that the second column from the left in Figure 3, beginning with 320, is "the phone book application." Appx10633. He further stated 320 is "an application summary window" for that application. *Id.* He asserted that 320 teaches a "limited list" of functions because "the phone book application has five functions" and 320 only shows "three functions." Appx10634. He testified that the two missing functions are "edit" and "delete." Appx10637.

With respect to Claim 13, which requires a "limited list" that is "a sub-set of all the functions offered by a given application," Dr. Rhyne repeated the same testimony. Appx10637.

But as Dr. Rhyne admitted, the two functions purportedly missing from his "limited list" were in fact simply further down the same menu. Appx10627 (testifying that if a user presses the down button, it will move from 320 to 323, which "will bring up two new functions that are also available in the phone book to edit or delete an entry."). Dr. Rhyne again admitted that fact on cross-examination. Appx10741 (admitting that the five functions of the phone book application are "all available through" the "menu" in Figure 3); Appx12006.

A reasonable jury could thus conclude that *Blanchard* does not teach the "*limited*" list required by Claim 1 and Claim 13 of the '020 patent, but instead

teaches a list of *all* functions within an application. *See E.E.O.C. v. Boh Bros. Const.*, 731 F.3d at 451 (appellate review requires "draw[ing] all reasonable inferences in the light most favorable to the verdict" even if there are "other inferences that [the court] might regard as more reasonable."). Indeed, *Blanchard* teaches that 320 through 324 are all part of one "Phone Book parent menu screen" and that user can access "any of the Phone Book features" using that menu. Appx13100 (7:14-18, 6:11-14).

The same is true regarding the '476 patent. Claim 1 requires a "limited list of data offered within" the underlying application. Addressing that claim, Dr. Rhyne shifted to the "mailbox application" in Figure 3. Appx10639. He testified that the "[07]" next to "Text Messages" shows data. *Id.* But Dr. Rhyne gave **no testimony** as to how the data shown was a "*limited* list" of data for the "mailbox application." *Id.* As to Claim 8 of the '476, which further requires a "limited list of functions" *and* "data" offered within the underlying application, Dr. Rhyne simply testified that the "mailbox application" **has** three functions. Appx10641. He gave no testimony that those three functions were a *limited* list of the mailbox application's functions. And he again said nothing as to a *limited* list of data.

Because Dr. Rhyne provided no testimony as to the "limited list" elements of Claim 1 and Claim 8 of the '476 patent at all, the only conclusion a reasonable jury could reach is that *Blanchard* does not anticipate those claims.

**B.    The PTAB Also Found That *Blanchard* Does Not Teach A "*Limited*" List.**

The PTAB has also rejected LG's invalidity assertions based on *Blanchard*. On March 15, 2017, the PTAB fully denied LG's *inter partes* review as to the '020 and '476 patents on the merits. IPR2015-01984 (Paper 40), IPR2015-01985 (Paper 41). The Board specifically found that LG and Dr. Rhyne "provided ***no evidence*** that . . . Figure 3 of Blanchard" teaches a "limited list" of either functions or data. IPR2015-01984 (Paper 40 at 11), IPR2015-01985 (Paper 41 at 12). The Board's conclusions are not presented here as evidence supporting the jury's verdict. Rather, the Board's decisions, which were reached as to the same facts under a lower burden of proof, confirm the *reasonableness* of the jury's verdict.[5]

**C.    *Blanchard*'s Menus Are Only Offered Within Launched Applications, Not While The Applications Remain Unlaunched.**

As explained in Section II.D, *supra*, an application cannot be "unlaunched" when a user is navigating a menu *within* that same application. If the "application summary window" is within the application itself, the application is necessarily launched. Section II.D (discussing Appx12764-65).

Dr. Rhyne repeatedly suggested that the menus in Figure 3 of *Blanchard* are menus within the respective applications themselves, allowing the jury to conclude

---

[5] In separate proceedings brought by Apple, involving entirely different art and arguments, the PTAB recently found challenged claims of the '020 and '476 to be unpatentable. Core Wireless will appeal. Those proceedings have no bearing on this appeal.

that the applications are thus not "unlaunched." Appx10625 ("Here, the application

is the mailbox application"), *id.* ("I've moved over to the phone book

application"), Appx10682-83, Appx12002. And although Dr. Rhyne testified that

the underlying applications in *Blanchard* were not "launched" until one of the

functions or data in the menus in Figure 3 was selected, a reasonable jury could

conclude that Dr. Rhyne conflated initiating a *function* or showing *data* with

launching the *application*. Appx10635-36 (testifying the phone book application

was unlaunched because phone book *entries* were not shown).[6]

### D.    The Jury Was Free To Give Dr. Rhyne's Testimony Little Weight.

Once an expert's credibility has been impeached, "the jury ha[s] every right

to discount" that testimony. *Silicon Graphics, Inc. v. ATI Technologies*, 607 F.3d

784, 797 (Fed. Cir. 2010). And if that means "the record contains no evidence" to

support a finding of anticipation, judgment as a matter of law is "correctly denied."

*Id.*

Dr. Rhyne's credibility was repeatedly impeached, Appx12003-04

(gathering citations), including as to his opinions that *Blanchard* taught the

"limited list" and "unlaunched state" limitations of the claims. Appx10741,

Appx10682-83. He was also impeached as to another purportedly anticipatory

---

[6] Construing "unlaunched state" as "not running" would also not support a judgment of anticipation. *Blanchard*'s menus are displayed within the underlying applications themselves, which are thus "running" in both senses of the term.

reference, Ericsson R380, which he ultimately admitted is not even "prior art." Appx10686.

The jury was thus free to at least severely discount Dr. Rhyne's testimony and to find that LG's evidence of anticipation was neither clear nor convincing.

### E.    LG's Arguments On Appeal Cannot Fill The Evidentiary Void.

LG argues that it presented "evidence that *Blanchard* discloses every limitation of the asserted claims." Blue Brief 48. It did not. Sections V.A & C, *supra*. And the jury was entitled to severely discount the evidence it did provide. Section V.D, *supra*. Accordingly, LG thus did not overcome the presumption of validity, and Core had no burden to present rebuttal testimony. Blue Brief 48.

Nor was Core's cross-examination "irrelevant" to the claims. Blue Brief 52-57. The consequence of the "unlaunched state" limitation is that an "application summary window" cannot appear *within* the underlying application itself, but must instead be accessed without causing *any* aspect of the underlying application to launch (display). *See* Sections V.C & II.D, *supra*. Core showed *Blanchard* does not meet that limitation because it does not give "an alternative way to access the application functionality" beyond the menus within each application. Appx10682-83, Appx12442-44.

Finally, "a jury or a court may reach a conclusion that a patent remains valid *solely* on the failure of the patent challenger's evidence to convincingly establish

the contrary." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed. Cir. 1986). The district court found that to be the case here. Appx18 ("LG failed to overcome the presumption of validity . . . by clear and convincing evidence. . . ."). Contrary to LG's assertions, Blue Brief 57-60, it was not required to do more.

### CONCLUSION

For the reasons above, the Court should affirm the judgment of liability.

Respectfully submitted,

*/s/ Kayvan B. Noroozi*

Marc A. Fenster                        Kayvan B. Noroozi
Reza Mirzaie                           NOROOZI PC
RUSS, AUGUST & KABAT                    1299 Ocean Ave., Suite 450
12424 Wilshire Boulevard, 12th Floor   Santa Monica, CA 90401
Los Angeles, California 90025          Telephone: (310) 975-7074
Telephone: (310) 826-7474              Facsimile: (844) 975-7074
Facsimile: (310) 826-6991

*Counsel for Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2017, a true and correct copy of the foregoing was timely filed with the Clerk of the Court using the appellate CM/ECF system, which will send notifications to all counsel registered to receive electronic notices.

*/s/ Kayvan Noroozi*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Rules of this Court, because it contains 13999 words (as determined by the Microsoft Word for Mac 2011 word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) and the Rules of this Court because it has been prepared in a proportionally spaced typeface using the Microsoft Word for Mac 2011 word-processing system in 14-point Roman font.

*/s/ Kayvan Noroozi*